UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JEROME GREEN, | |
| Plaintiff, | |
| v. | Case No. 19-cv-627-JPG |
| STEPHEN RITZ, | |
| Defendants. | |

## MEMORANDUM AND ORDER

**GILBERT, District Judge:**

This matter is before the Court for consideration of a Motion for Summary Judgment filed by Defendant Steven Ritz, D.O. ("Defendant" or "Dr. Ritz"). Plaintiff Jerome Green ("Plaintiff" or "Green"), through counsel, opposes the motion. (Doc. 68). Defendant has filed a reply. (Doc. 69). For the reasons set forth below, the motion shall be **DENIED**.

### BACKGROUND

This case involves a federal suit for deprivations of constitutional rights pursuant to 42 U.S.C. § 1983. Green alleges he had a swollen keloid on his neck, which Dr. Ritz denied multiple requests for removal and only provided Green with aspirin despite alleged serious pain. (Doc. 6 at 2). The keloid eventually "erupted," became infected, and Green was only provided with band-aid and tape. *Id*. Plaintiff suffered with the infected keloid before being referred for outside surgery. *Id*. Following preliminary review of this matter under 28 U.S.C. § 1915A, the Court dismissed defendant Wexford Health Sources, Inc. ("Wexford") for a failure to state a claim for relief for deliberate indifference. Green was allowed to proceed with a claim for deliberate indifference against Dr. Ritz, a Wexford employee, for delaying Green's surgery for removal of his keloid for over a year. (Doc. 6 at 3).

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Dr. Ritz filed for summary judgment on the merits of the claim. Dr. Ritz argues that Green did not suffer from an objectively serious medical condition, and Dr. Ritz was not deliberately indifferent to Green's serious medical needs under the Eighth Amendment because he relied on the treatment of other doctors and exercised his own medical judgment in denying Green anything beyond "conservative onsite treatment." Additionally, Dr. Ritz argues he is shielded from liability by qualified immunity.

**PLAINTIFF'S RESPONSE**

Green opposes the motion. Green argues that his keloid was extremely painful, and evidence in the record suggests Dr. Ritz exercised no medical judgment in denying Green's requests for outside treatment, and his reasons were speculative, pretextual, and contrary to Wexford's medical guidelines. Additionally, Green argues Dr. Ritz has no claim for qualified immunity because qualified immunity does not apply to private medical personnel in prisons.

**FACTS**

Green is an inmate at Menard Correctional Center ("Menard"). Dr. Ritz was employed by Wexford as Corporate Utilization Management ("UM") Medical Director. Dr. Robert Smith was a Wexford physician mainly working in UM. Dr. Mohammed Siddiqui ("Dr. Siddiqui") was employed by Wexford as the Menard Medical Director. UM Physicians review requests for outside treatment, which are reviewed for medical necessity and cost of treatment. Wexford pays for any outside referrals of inmates. Such requests for outside treatment are submitted by site medical directors, and the UM team will have a collegial review to discuss the request. If a request is not agreed upon during the collegial review, an Alternate Treatment Plan ("ATP") is recommended. Once an ATP is recommended, the date of when the case needs to be readdressed

is provided during the collegial call by the UM physician. Once an ATP has recommended, the site director *can* appeal the ATP, which exists because the treating physician has direct involvement with the patient.

     Green experienced a keloid on his neck, which is a skin condition caused from overgrowth of scar tissue, and testified it caused substantial pain. Green testified that by May 29, 2017, he had been expected the pain for nearly a year and a half, and until he was provided surgery in May 2018. The keloid exhibited brown or yellow drainage between April 2018 and May 2018. Additionally, as of May 29, 2017, the keloid had brown discharge and an odor. Green was provided medication for the drainage, and it only changed the color of the drainage to yellow. Menard medical personnel tested the drainage and determined the keloid was infected. Additionally, Dr. Siddiqui testified between April 13, 2017, and July 20, 2017, the keloid was "oozing blood . . . at the base of the keloid." (Doc. 68 at 9). By November 22, 2017, the keloid was chronically bleeding. *Id*. Green received gauze and dressings for his keloid everyday between the time of the first referral request and May 2018. However, the keloid grew from 10 cm by 4 cm in April 2017 to 13 cm by 6 cm in May 2018. *Id*.

     Green indicated his pain would disrupt his sleep, and his pain was a 9/10. Green also indicated his keloid altered his activities, such as his inability to write his autobiography. He could no longer play cards because other inmates did not want to touch the cards he touched because of the presence of blood and drainage. Green could no longer work because the pain affected his concentration, and the keloid was so heavy it affected his breathing. Additionally, Green would get into fights with cellmates because of the keloid's odor and blood, which spilled into common areas. Additionally, because he could not chew fast enough during the time allotted because of how the keloid pressed on his throat, he received a feed-in permit. *Id*. at 10.

Plaintiff alleges there were five separate instances of documented denials of treatment.

**a.     April 28, 2017**

On April 13, 2017, Green saw a nurse, who noted his keloid was "large" and "sausage-like." The nurse prescribed an antibiotic for 14 days and sent in a referral request to Wexford UM for a general surgical consultation. On April 28, 2017, Green saw the nurse again and prescribed another antibiotic for 10 days. On that same day, Dr. Siddiqui and Dr. Ritz discussed the April 13 referral where they denied the referral request and agreed to an ATP to obtain notes about how long the keloid was present, how it impacted Green's daily activities, and a picture. Dr. Ritz does not recall the treatment plan for the keloid at this time or what the treatment options he considered.

On May 29, 2017, Plaintiff was seen in nurse sick call, and he reported stabbing pain and was given Acetaminophen. On June 27, 2017, Plaintiff saw Dr. Siddiqui who directed photos be sent to Dr. Ritz. (Doc. 67 at ¶ 16).

**b.     July 25, 2017**

On July 24, 2017,[1] Dr. Siddiqui and Dr. Ritz discussed Green's condition in another collegial review. On that same day, Dr. Siddiqui appealed Dr. Ritz's April 28, 2017, denial of surgical consultation. On July 25, 2017, Dr. Ritz denied the surgical consultation. The denial states that photos of the keloid were received, there were no signs of infection or drainage, the keloid was a pre-existing cosmetic condition, the keloid does not meet the IDOC criteria for surgical removal, and the treating physicians should continue to monitor on site and treat symptomatically. Green's ATP was to treat his symptoms.

---

[1] Defendant indicates that the collegial review occurred on July 20, 2017, and Plaintiff indicates it occurred on July 24, 2017. (Doc. 67 at ¶ 18); (Doc. 68 at 6).

    **c.**    **October 30, 2017**

On September 14, 2017, Green was seen by a nurse for the keloid, who charted the presence of drainage, tenderness, pain, but no swelling or redness. Dr. Siddiqui ordered Bactrim DS for 10 days. On October 11, 2017, Green saw the nurse regarding his keloid again and the nurse charted the keloid was unchanged with no drainage. The nurse prescribed Robaxin for two weeks, and Clinamycin for 7 days.

On October 30, Dr. Siddiqui saw Green for the keloid again and Robaxin renewal. Dr. Siddiqui charted "neck-bleeding" and referred Plaintiff to collegial review for a third time. Dr. Siddiqui asked for a general surgery consultation because Green had a "humongous" and bloody keloid. (Doc. 68 at 7). On November 2, 2017, Dr. Siddiqui and Dr. Smith discussed the October 30 request for collegial review.[2] Dr. Smith did not approve the general surgeon for a consultation and an ATP was elected to provide silicone gel sheets to reduce the size and soften Green's keloid. However, Dr. Smith stated the keloid had "bloody drainage" and surgical removal had a "high risk of complication" because of the keloid's location. Dr. Smith indicated that if silicone gel sheets were unsuccessful, he would recommend a dermatologist.

    **d.**    **November 30, 2017 and December 1, 2017**

On November 21, 2017, Plaintiff was issued a triple antibiotic ointment with his dressing supplies. On November 22, 2017, Green saw Dr. Siddiqui who issued an extra feed-in permit. Dr. Siddiqui filed another request for an outside surgical consultation. The referral notes indicate the keloid was "humongous" with a chronic bleed, and that photographs were sent separately. On

---

[2] Dr. Smith became involved with collegial reviews at Menard because Dr. Ritz was overseeing Wexford's contracts with Maryland due to a departure of a UM physician.

November 30, 2017, Dr. Siddiqui and Dr. Smith discussed the November 22, 2019, referral request in collegial review. Dr. Smith did not approve the request for surgical consultation.

On December 1, 2017, Dr. Ritz reviewed the referral request for Green to see a general surgeon. Dr. Ritz's records indicate that now the keloid had chronic bleeding and intermittent purulent drainage, meaning that the drainage was not clear. Dr. Ritz did not approve the request for a surgical consultation.

  e.  **January 5, 2018**

On December 14, 2017, Green saw a nurse about his keloid and complained of the drainage and foul order. There was blood on Green's t-shirt. On December 21, 2017, Dr. Siddiqui submitted another request for a surgical consultation. His request noted the keloid was "continuously bleeding and infected" and required an "outside eval[uation]." (Doc. 68 at 9). Dr. Smith covered the January 4 collegial review, denied the request for surgical consultation, and requested photographs of Green's keloid be taken and sent to Dr. Ritz for input. Dr. Ritz, when deposed, indicated he does not recall reviewing the pictures but did receive them.

  f.  **Surgery**

On January 24, 2018, a Wexford UM nurse sent Dr. Ritz an email stating Green was upset nothing was done about his keloid. The nurse's email stated "Dr. Smith wanted this to be deferred to you for a decision. ... Dr. Smith feels that it's [sic] anatomical location makes it too risky to remove ... They are now requesting a Plastics Eval. ... Dr. Smith wanted pictures sent in and for the case to be sent to you. Pics are attached." In response to this email, Dr. Ritz explained that "[i]n order to comment, further objective information is needed," specifically: objective evidence of ADL dysfunction and objective evidence of growth or active recurrent infection, or bleeding that required physician intervention. On February 2, 2018, Dr. Siddiqui provided

information in response to Dr. Ritz's questions. Dr. Siddiqui explained that Green was unable to sleep on his left side due to the sizejn and location of the keloid, that the keloid had "frequent bleeding and infections," and that the keloid was growing and so large that it was restricting the movement of Green's neck.

On February 6, 2018, Dr. Ritz received an email informing him that Dr. Siddiqui and Menard medical staff wanted to discuss Green's case. The next day,[3] Dr. Steven Meeks ("Dr. Meeks"), IDOC's Medical Director, had overridden Wexford's decision and approved Green for a surgical evaluation. Dr. Meeks had final authority, and Wexford's role as UM was over. On February 7, 2018, Green was formally authorized to have a surgical consultation.

On March 23, 2018, Green had a surgical consultation at Lincoln Surgical Center. The doctor informed Green that the keloid had grown too large to perform surgery and recommended a head and neck reconstruction surgeon. On May 4, 2018, Plaintiff's keloid was evaluated by a head and neck surgeon at St. Louis University ("SLU") who concluded he could perform a successful surgery. On May 10, 2018, Dr. Siddiqui presented Green in a collegial review to Dr. Ritz for a left mass resection at SLU and Dr. Ritz approved the request. Surgery was performed to remove the keloid in May 2018.

Two years later, the keloid grew back. In August 2020, Green had a second surgery, and the keloid has not grown back.

**ANALYSIS**

Summary judgment will be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ.

---

[3] Dr. Ritz's brief indicates that the decision by IDOC to direct Plaintiff to be sent for surgical evaluation was done on February 6 and Green's belief indicates this decision was made on February 7.

P. 56(a). The facts and all reasonable inferences are drawn in favor of the nonmoving party. *Kasten v. Saint–Gobain Performance Plastics Corp.*, 703 F.3d 966, 972 (7th Cir.2012). Summary judgment is improper "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The Eighth Amendment to the Constitution prohibits the infliction of cruel and unusual punishments on prisoners. U.S. Const. amend. XIII. An inmate's punishment "must not involve the unnecessary and wanton infliction of pain," *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and "deliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

To determine if the Eighth Amendment has been violated in the prison medical context, the Court perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition. *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016), as amended (Aug. 25, 2016) (internal citations omitted). In short, there is an objective and subjective element to this test.

i. **Plaintiff suffered an objectively serious medical condition**

In evaluating an Eighth Amendment claim, we start by determining if the medical condition the plaintiff suffered was objectively serious. *Id*. "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). It is not necessary for such a medical condition to "be life-threatening to be serious; rather, it could be a condition

that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

Here, the facts are not disputed that multiple physicians including Dr. Siddiqui, diagnosed the keloid as requiring treatment. Additionally, based on descriptions of the keloid in the record as "large," "fist-sized," "sausage-like," "oozing blood," discharge of varying colors from brown to yellow, infected, and grown from 10 cm by 4 cm in April 2017 to 13 cm by 6 cm in May 2018. Additionally, Green testified he was uncomfortable, indicated he was in substantial pain, could not sleep because of the pain, had difficulty engaging in daily activities, and had to receive a feed-in permit because he could not chew quickly based on the placement of the keloid. Additionally, multiple health professionals including Dr. Siddiqui, Dr. Meeks, other medical professionals at Menard, including surgeons who later evaluated Green, indicated the keloid had grown, was infected, and needed to be treated, and eventually operated on. The Court finds, providing all reasonable inferences in favor of Green, a layperson would find that Green's keloid needed to be treated, and therefore, was an objectively serious medical condition.

Defendant argues that a list of cases within this circuit regarding keloids show that it is not a serious medical condition. Those cases are distinguishable. In *Wheeler v. Talbot*, the Seventh Circuit Court of Appeals held that plaintiff's keloid was not an objectively serious medical condition. *Wheeler v. Talbot*, 695 F. App'x 151, 154 (7th Cir. 2017). In *Wheeler*, plaintiff was seen by Talbot four separate times, who concluded the keloid was purely a cosmetic issue. The Seventh Circuit reasoned it was not objectively serious because plaintiff did not contradict that during the exams, the keloid was intact and showed no signs of infection, oozing, bleeding, or trauma. *Id*. Here, the evidence in the record, including in his chart and referral notes, shows that Green's keloid was indeed infected, oozing, and bleeding. *Wheeler* is distinguishable.

Defendant also cites *Leach v. Ritz* in its support. No. 18-CV-947-NJR-RJD, 2019 WL 8063921 (S.D. Ill. Sept. 9, 2019), report and recommendation adopted, No. 18-CV-947-NJR-RJD, 2019 WL 6713258 (S.D. Ill. Dec. 10, 2019). *Leah* involves the same doctors in this case – Dr. Ritz and Dr. Siddiqui. Here, the *Leah* court found plaintiff's keloids were not objectively serious because Dr. Siddiqui "found no signs of infection or active folliculitis." *Id*. at 3. Additionally, the court noted the objective findings in the medical records do not establish a finding of a serious medical need. *Id*. Additionally, the court noted a medical condition *can* be objectively serious if it affects the individual's daily activities, or causes chronic or substantial pain, and did not find the record supported that finding. *Id*. (noting plaintiff has lived with his keloid for two years and did not seek any further medical treatment). Here, the record indicates Green's keloid showed drainage, tenderness, and pain (September 14), "bleeding" (October 30), "bloody drainage" (November 2), chronic bleeding (November 22), intermittent purulent drainage (December 1). Additionally, the record is clear at least on January 5, 2018, Sr. Siddiqui noted the keloid was draining, bloody and dropping on Green's t-shirt, and showed signs of infection. In fact, he was treated for the infection with antibiotics on numerous occasions. Green complained of significant pain and did not live with his keloid for years while litigation was pending. This case is distinguishable from *Leach*.

Defendant also cites *Warren v. Coe* in its support. No. 3:17-CV-0917-GCS, 2020 WL 1703603 (S.D. Ill. Apr. 8, 2020). In *Warren*, the court held that plaintiff's keloid on his ear was not a "serious medical condition" because there were no signs of infection or bleeding, and there was no evidence the keloid affected his daily activities. *Id*. at *5. However, as stated above, there is ample evidence that Green's keloid was infected, bloody, and draining various colors. Additionally, there is ample evidence the keloid affected Green's daily life. Green indicated he

could not sleep properly, could not write, or read as long because of the pain, and required a feed-in permit because he could not chew fast to eat his food during the allotted time in the food hall. Defendant argues that Green's claims of impacts on daily living are rebutted because he was hurt while trying to work out. However, the Court provides reasonable inferences in favor of Green and looks at his complaints of sleep, substantial pain, recorded attempts to gain medical treatment, feed-in permit, and conflict with other inmates as sufficient evidence a reasonable jury could find in favor of a finding his keloid was objectively serious. This case is distinguishable from *Warren*.

Here, Defendant argues that Green's keloid was simply cosmetic and not life threatening. However medical condition need not be life threatening to be objectively serious. *Gayton*, 593 F.3d at 620. Drawing all reasonable inferences in favor of Green, the Court finds that a jury could find the keloid was objectively serious.

Green argues that there are other courts within this circuit that have shown that keloids can be an objectively serious medical condition. *Conner v. Hoem*, No. 17-CV-948, 2018 WL 11265508, at *8 (E.D. Wis. Sept. 13, 2018), aff'd sub nom. *Conner v. Waterman*, 794 F. App'x 527 (7th Cir. 2020) ("If a jury were to credit Mr. Conner's characterization of his keloids [bleed, ooze, and painful], it could reasonably conclude that he suffered from an objectively serious medical condition."). The Court agrees a reasonable jury could conclude he suffered from an objectively serious medical condition.

  **ii.**   **Whether Dr. Ritz was Deliberately Indifferent to Green's Medical Needs**

To determine if a prison official acted with deliberate indifference, the Court looks into his or her subjective state of mind. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). For a prison

official's acts or omissions to constitute deliberate indifference, a plaintiff does not need to show that the official intended harm or believed that harm would occur. *Id*. at 992. But showing mere negligence is not enough. *Estelle*, 429 U.S. at 106, 97 S.Ct. 285; *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) ("Deliberate indifference is not medical malpractice."). Even objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it should be known—is insufficient to make out a claim. *Farmer*, 511 U.S. at 836–38, 114 S.Ct. 1970. Instead, the Supreme Court has instructed that a plaintiff must provide evidence that an official actually knew of and disregarded a substantial risk of harm. *Id*. at 837, 114 S.Ct. 1970.

The Seventh Circuit has identified several circumstances that can be enough to show deliberate indifference. First, and most obvious, is a prison official's decision to ignore a request for medical assistance. *Petties*, 836 F.3d at 729. An inmate does not need to show he was "literally ignored," but if a "risk from a particular course of medical treatment (or lack thereof) is obvious enough, a fact finder can infer a prison official knew about it and disregarded it." *Id*. (internal citations omitted). In a medical context, "medical professional's treatment decision must be "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996). Evidence *some* medical professionals would have chosen a different course of treatment is insufficient. *Petties*, 836 F.3d at 729.

A hint of where a medical professional is beyond the permissible bounds of competent medical judgment is "when a doctor refuses to take instructions from a specialist." *Id*. Another, is where he or she "fails to follow existing protocol." *Id*. Another example that might establish a departure is where a prison official "persists in a course of treatment known by be ineffective." *Id*. In *Petties*, the Seventh Circuit states, for example, this can be shown if "knowing a patient

faces a serious risk of appendicitis, the prison official gives the patient an aspirin and sends him back to his cell, a jury could find deliberate indifference even though the prisoner received some treatment." *Petties*, 836 F.3d at 730; *see also Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) (continuing to treat severe vomiting with antacids over three years created material fact issue of deliberate indifference), Additionally, choosing a "easier and less efficacious treatment" without exercising professional judgment, can also constitute deliberate indifference. *Estelle*, 429 U.S. 97, 105, 97 S.Ct. 285 (material fact of deliberate indifference where there was a painkiller and ice treatment for suspected fractures). The Seventh Circuit has cautioned that while the cost of treatment can be a factor in determination of treatment, medical professionals cannot simply resort to easier course of treatment that they know is ineffective. *Petties*, 836 F.3d at 730.

   Defendant argues that the facts indicate Dr. Ritz, of the four collegial reviews he was involved in, did not disregard a substantial risk of harm. (Doc. 67 at 14). First, Defendant argues that Green's disagreement with the decisions to not surgically remove the keloid is insufficient to show deliberate indifference. *Id*. Green argues that while Dr. Ritz noted that every keloid is "unique" and dependent on "multiple different variables," his proffered reasons were not particular to Green and Green's keloid. (Doc. 68 at 20). The Court believes there is a factual issue as to whether Dr. Ritz was deliberately indifferent.

   Defendant argues that Green cannot show that the four collegial reviews Dr. Ritz participated in (April 28, 2017, July 25, 2017, December 1, 2017, and January 24, 2018), demonstrate Dr. Ritz knew of a substantial risk of harm and disregarded the risk. On April 28, 2017, the first instance of a collegial review, Dr. Ritz and Dr. Siddiqui agreed to an ATP to obtain additional information, monitor the keloid for drainage, and send a picture. (Doc. 67 at 14-15). The Court is unclear as to what monitoring was conducted, and what follow up was

done. Dr. Ritz requested a picture during this April collegial review and testified he received a picture by July 25, 2017. It is reasonable that Dr. Ritz was attempting to treat the keloid conservatively. However, on May 29, 2017, Plaintiff was seen in nurse sick call, reported stabbing pain, was given Acetaminophen. By the next collegial review on July 20, 2017, Dr. Ritz and Dr. Siddiqui discussed Green's keloid and felt that it did not warrant a surgical consultation because the picture did not show signs of infection or drainage. Again, it is clear that Dr. Ritz wanted to treat the keloid symptomatically and conservatively.

On September 14, 2017, Green was seen by a nurse, who charted the presence of drainage, tenderness, and pain. At this point, months have passed since Green's initial collegial review and a jury could reasonably infer that he was still showcasing pain, and now demonstrating drainage, a reason for a conservative ATP during the first collegial review. While Dr. Smith and Dr. Ritz were involved in the October 30 collegial review, a conservative treatment of silicone sheets was given, and a surgical consultation was denied. By November, referral notes by Dr. Siddiqui show that the keloid was "humongous" with a chronic bleed. However, Dr. Smith did not approve a surgical consultation request on November 22.

A few weeks later on December 1 when Dr. Ritz reviewed another referral request by Dr. Siddiqui, records indicate the keloid had chronic bleeding and intermittent purulent drainage. However, Dr. Ritz again did not approve the request for a surgical consultation. Green does not need to show that he was "literally ignored" but a fact finder may infer at this point that Green's keloid was demonstrating chronic bleeding, colored drainage, and causing Green significant pain, and that a conservative treatment of treating symptoms and silicone sheets was not treating the keloid effectively. *Petties*, 836 F.3d at 729.

While the law is clear that there is no constitutional violation where there is evidence some medical professionals would have chosen a different course of treatment, *Petties*, 836 F.3d at 729, Dr. Siddiqui, another treating physician, testified that the conservative treatments were ineffective. Dr. Siddiqui continuously requested a surgical referral for outside surgical referral when the keloid was not improving. *Petties*, 836 F.3d at 731 ("But repeatedly, we have rejected the notion that the provision of some care means the doctor provided medical treatment which meets the basic requirements of the Eighth Amendment."). Additionally, the facts show that the IDOC Medical Director, Dr. Meeks overturned Dr. Ritz's decision not to refer for a surgery, which is a rare occasion. A jury could find that, while there was a difference of medical opinion, Dr. Ritz was persisting "in a course of treatment known by be ineffective" and other physicians had to intervene to get Green a surgical referral. *Id*. at 730.

The Court understands Dr. Smith's perspective (enshrined in an email from a nurse to Dr. Ritz on January 24, 2018) that Dr. Smith believes that surgery was too risky to remove because of its "anatomical location." However, as Green argues, the "risks of surgery was something a surgeon could decide." (Doc. 68 at 24). The Court agrees, especially in light of the fact Green had been complaining of subjective pain, indicated he could not do certain daily activities, and was demonstrating drainage and bleeding from April 2017 to January 2018. A reasonable jury could find, especially by the third, fourth, or fifth denial of surgical consultation that choosing a "easier and less efficacious treatment" could constitute deliberate indifference. *Estelle*, 429 U.S. at 104–05, 97 S.Ct. 285.

Green argues that there is evidence of deliberate indifference because Dr. Ritz did not consider a treatment suggested by Wexford's published guidelines. Specifically, Green points to a guideline provision requiring a consideration of a dermatology referral for "extremely large" or

"symptomatic" keloids. (Doc. 68 at 21). In response, Defendant argues that he *did* consider a referral to a general surgeon and was not deliberately indifferent to considering a surgical referral instead of a dermatology referral. (Doc. 69 at 2). Additionally, Defendant argues that "Plaintiff offers no evidence that Ritz's decisions would have been different had Ritz considered a dermatology referral rather than a surgical referral." *Id*. Considering Dr. Ritz's lack of recollection on this issue, and in totality of the rest of the evidence in the record, the Court believes this is yet another factual issue where summary judgment is inappropriate. Additionally, Defendant does not show us caselaw that requires Green show evidence that the guideline requirement, here a dermatology referral, would have been different. At summary judgment, Defendant must set forth evidence that shows there are no material disputes.

      Green also points to the fact that surgery was ultimately approved in May 2018 by Dr. Ritz, which indicates a factual issue that his previous denials were medically unsound. Defendant argues that Dr. Ritz's reason for ultimately approving the surgical evaluation was because he was "expected" to approve the surgery referral after the IDOC Medical Director, Dr. Meeks, had approved the surgical evaluation. As the court in *Petties* notes that context of a doctor's treatment decision can sometimes "override his claimed ignorance of the risks." *Petties*, 836 F.3d at 731. Specifically, *Petties* states that these context clues "existence of documents the doctor regularly consulted which advised against his course of treatment, evidence that the patient repeatedly complained of enduring pain with no modifications in care, inexplicable delays or departures from common medical standards, or of course, the doctor's own testimony that indicates knowledge of necessary treatment he failed to provide." *Id*. This Court believes the jury is entitled to weigh this evidence, and this evidence produces a factual issue not appropriate for summary judgment.

Defendant argues this case is analogous to that of *Stallings v. Zhang*, 607 Fed. Appx. 591, 592-93 (7th Cir. 2015). In *Stallings*, the Seventh Circuit affirmed the district court granting summary judgment in favor of Williams and other Stateville medical professionals, finding that their conservative treatment of the inmate's keloids, which likewise included prescribing oral and topical antibiotics and creams, and administering steroid injections, satisfied the Eighth Amendment. *Stallings* noted there was any absence evidence that the Stateville medical professionals deviated from accepted professional standards. *Id*. However, as noted above, there is some evidence that Dr. Ritz deviated from the professional standards and persisted in potentially ineffective conservative treatment of Green's keloid after sustained pain, drainage, and infection.

Defendant further points to *O'Quinn v. Feinerman*, Case No. 10-CV-917-GPM, 2013 WL 1287067, at *5 (S.D. Ill. Mar. 28, 2013). In this case, the court granted summary judgment where plaintiff complained the treatment of his keloids amounted to deliberate indifference. This case is distinguishable because there were no factual issues, records indicate plaintiff did not complain of keloids with a visit with defendant, and defendants did not find evidence of either blood, puss or infection. *Id*. Here, the Court has found genuine issue of material fact Dr. Ritz acted with deliberate indifference in treating Green's keloid.

For all these reasons, and providing all reasonable inferences in favor of Green, the Court finds Dr. Ritz has not met its burden of showing there are no material facts in dispute entitling him to summary judgment. Green has a right for a jury to hear the evidence and to determine whether Dr. Ritz was deliberately indifferent in treating his keloid.

    **iii.**    **Whether Dr. Ritz is shielded based on qualified immunity**

Defendant argues that Dr. Ritz is entitled to summary judgment based on qualified immunity (Doc. 67 at 19-20). However, "qualified immunity does not apply to private medical personnel in prisons." *Petties*, 836 F.3d at 734. Additionally, even if Dr. Ritz were entitled to qualified immunity, "threshold factual questions of the defendants' states of minds remain disputed" and therefore, "summary judgment on the basis of qualified immunity is inappropriate." *Id*. (internal citations omitted).

## CONCLUSION

The Court hereby **DENIES** Defendant Steven Ritz, D.O.'s Motion for Summary Judgment (Doc. 66). The Court will schedule a telephone status conference by separate order to select dates for the Final Pretrial Conference and Jury Trial.

**IT IS SO ORDERED.**
**DATED: March 7, 2023**

/s/ J. Phil Gilbert
J. PHIL GILBERT
U.S. DISTRICT JUDGE